# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ST. JUDE MEDICAL S.C., INC.**, | Case No. 3:15-mc-00099-SI |
| Plaintiff, | **OPINION AND ORDER ON MOTION TO COMPEL COMPLIANCE WITH THIRD-PARTY SUBPOENA** |
| v. | |
| **LOUISE MARIE JANSSEN-COUNOTTE**, | (Principal case pending in U.S. District Court, Western District of Texas, Austin Div., Case No. A-14-CA-877-SS) |
| Defendant, | |
| and | |
| **BIOTRONIK, INC.**, | |
| Third-Party Subpoena Recipient. | |

Paul A. C. Berg, COSGRAVE VERGEER KESTER LLP, 888 S.W. Fifth Avenue, Suite 500, Portland, OR 97204; Stephen M. Nickelsburg and Roni Bergoffen, CLIFFORD CHANCE US LLP, 2001 K Street NW, Washington, DC 20006-1001; M. Scott Incerto and James I. Hughes, NORTON ROSE FULBRIGHT US LLP, 98 San Jacinto Boulevard, Suite 1100, Austin, TX 78701-4255; Layne E. Kruse and Darryl W. Anderson, NORTON ROSE FULBRIGHT US LLP, 1301 McKinney, Suite 5100, Houston, TX 77010-3095. Of Attorneys for Plaintiff.

Sean Donahue, DONAHUE & ASSOCIATES, One S.W. Columbia Street, Suite 1625, Portland, OR 97258-2021; James Maldonado, Corporate Counsel, BIOTRONIK, INC. Of Attorneys for Third-Party Subpoena Recipient Biotronik, Inc.

No appearance was entered by Defendant Louise Marie Janssen-Counotte.

PAGE 1 – OPINION AND ORDER

**Michael H. Simon, District Judge.**

There are two threshold issues presented in the pending motion to compel compliance with a third-party subpoena that need to be resolved before it is appropriate to turn to the more specific objections raised by the subpoena recipient. The first concerns the circumstances under which a domestic corporate entity that has been served with a third-party subpoena must also search for responsive records held by legally-distinct but affiliated entities in other countries. The second concerns the circumstances under which a plaintiff alleging misappropriation of trade secrets may proceed with formal discovery, notwithstanding the assertion by a third-party subpoena recipient that the plaintiff has failed to describe with particularity the trade secrets at issue. After resolving these two issues, the Court will explain why it is appropriate in this case to appoint a special master for third-party discovery to address the remainder of the pending discovery dispute.

## BACKGROUND

In a case pending in federal court in Austin, Texas, Plaintiff has sued Defendant for theft and threatened misappropriation of trade secrets and other confidential information, among other claims. Defendant was a high-ranking officer and employee of Plaintiff's European affiliate. On July 1, 2014, Defendant left her employment with Plaintiff's affiliate in Europe to become the President for U.S. operations in the U.S. affiliate of one of Plaintiff's principal global competitors. In a forensic review of the computer equipment used by Defendant shortly before she left Plaintiff's employ, Plaintiff discovered evidence that Defendant had copied, emailed, and downloaded what Plaintiff contends are among its most competitively sensitive trade secrets and other confidential information. Pursuant to Rule 45 of the Federal Rules of Civil Procedure, Plaintiff served on Defendant's new employer, the U.S. affiliate of Plaintiff's global competitor, a third-party subpoena for documents and electronically-stored information ("ESI"). Plaintiff

now moves for an order compelling compliance with that subpoena. The third-party subpoena

recipient, Defendant's new employer, objects on several grounds. As explained below, Plaintiff's

motion to compel is granted in part. In addition, pursuant to Rule 53 of the Federal Rules of Civil

Procedure, the Court will appoint a special master, as more fully set forth in a separate order.

## A.  The Parties

### 1.  Plaintiff, St. Jude Medical S.C., Inc.

Plaintiff, St. Jude Medical S.C., Inc. ("St. Jude S.C."), is a Minnesota corporation

headquartered in Austin, Texas. St. Jude S.C. is a subsidiary of the global medical technology

company St. Jude Medical, Inc. ("St. Jude Inc."). St. Jude S.C. is the U.S. sales and marketing

arm of St. Jude Inc. and markets St. Jude Inc.'s products, including cardiac rhythm management

("CRM") devices, in the United States. The global company, St. Jude Inc., also is the ultimate

owner of St. Jude Medical International, Inc., which wholly owns SJM International Holding,

S.a.r.l. That company, SJM International Holding, owns St. Jude Medical Luxembourg, S.a.r.l.,

which wholly owns both St. Jude Belgium and St. Jude Netherlands. These latter two companies

own, respectively, SJM Coordination Center BCVA (a Belgium company) and St. Jude Medical

Netherland BV (a Dutch company) (collectively, "St. Jude Belgium/Netherlands"). *St. Jude Med.*

*S.C., Inc. v. Louise Marie Janssen-Counotte*, 2014 WL 7237411, at *1 n.1 (W.D. Tex. Dec. 17,

2014).

### 2.  Defendant, Louise Marie Janssen-Counotte

Defendant, Louise Marie Janssen-Counette ("Janssen"), was previously employed in

Belgium and the Netherlands by St. Jude Belgium/Netherlands, where she served as a vice

president and focused on St. Jude Inc.'s European operations. *Id*. at *1. In the underlying action

pending in federal court in Texas, the Court describes Janssen's alleged activities at issue in the

that lawsuit as follows:

As an employee of St. Jude Belgium/Netherlands, Janssen attended a three-day meeting in Dallas, Texas from June 2–4, 2014 (the "Dallas Conference"), designed to bring together high-level executives from St. Jude Inc.'s various sub-entities in order to discuss company development and strategy. Over the course of the three days, the attendees were exposed to hundreds of slides, and the presentations included confidential information. In particular, Janssen participated in the development of a five-year global strategic plan (the "Strat Plan") for competing against other medical technology companies, and this Strat Plan was one of the focuses of the Dallas Conference.

On June 27, 2014, Janssen announced she was leaving St. Jude Belgium/Netherlands, and although she initially would not disclose her new employer for claimed reasons of confidentiality, Janssen ultimately disclosed on September 8, 2014 she had joined Biotronik, Inc., a competitor of St. Jude S.C, as President of U.S. operations. St. Jude S.C. became concerned Janssen's behavior had been improper and conducted forensic investigations of Janssen's company computer and phone. Based on its research, St. Jude S.C. alleges Janssen began employment negotiations with Biotronik prior to attending the Dallas Conference, and she used removable media devices from late May through her departure from St. Jude Belgium/Netherlands on July 1, 2014, to collect confidential information and trade secrets, including portions of the Strat Plan, to take with her to Biotronik.

*Id.*

In its motion to compel Biotronik, Inc. to comply with St. Jude S.C.'s third-party subpoena served on Biotronik, Inc., St. Jude S.C. adds further detail to its allegations. As St. Jude S.C. explains, based on the deposition testimony given by Janssen in the underlying case, the owner of the global Biotronik group of entities (Max Schaldach) and another high-ranking Biotronik European executive (Christian Bluemel) asked Janssen, during the week of May 19, 2014, about her joining Biotronik either in Europe or the United States. The following Saturday, May 24, she emailed her St. Jude contracts and benefits information to her personal email address. The following Monday, May 26, she inserted 41 separate removable media devices (*e.g.*, thumb drives) into her St. Jude computer. Before attending St. Jude's Dallas Conference on

June 2-4, Janssen also exchanged text messages with her "former" boss at Biotronik.[1] Janssen left St. Jude Inc. on July 1, 2014.

### 3. Third-Party Biotronik, Inc.

Third-party subpoena recipient Biotronik, Inc. is a competitor of Plaintiff St. Jude S.C., including in the CRM industry, in the United States. Biotronik, Inc. is a Delaware corporation with its headquarters in Oregon. Biotronik SE & Co. KG ("Biotronik SE") is a German company with its headquarters in Berlin. Among other things, Biotronik SE manufactures and sells CRM devices from Germany to customers worldwide, including Biotronik, Inc. Biotronik SE and Biotronik, Inc. are sister companies. They are both owned by the same parent, MS Holding II SE, which also is a German company. *See JMA, Inc. v. Biotronik SE & Co. KG*, 2013 WL 1402322, at *1 (S.D. Fla. Apr. 5, 2013). According to a declaration filed by its Corporate Counsel, Biotronik, Inc. does not share computer databases with any of its European affiliates, is a separate legal entity from its European affiliates, and "does not share the same Board of Directors, officers, or internal legal group with any of its European affiliates." Dkt. 6-1.

### B. The Underlying Federal Lawsuit in Texas

Plaintiff, St. Jude S.C., commenced the underlying lawsuit against Janssen in federal court in Texas on September 16, 2014. *St. Jude Med. S.C., Inc. v. Louise Marie Janssen-Counotte*, Case No. A-14-CA-877-SS (W.D. Tex., Austin Div.). Plaintiff alleges claims of theft and threatened misappropriation of trade secrets and other confidential information in violation of the Texas Uniform Trade Secrets Acts ("TUTSA"), conversion, and violation of the federal Computer Fraud and Abuse Act, 15 U.S.C. § 1030. Plaintiff seeks money damages, a declaratory judgment, and preliminary and permanent injunctive relief.

---

[1] At some time before working for St. Jude, Janssen worked for Biotronik. She apparently left Biotronik for St. Jude and then in the summer of 2014 left St. Jude to return to Biotronik.

Plaintiff moved for a temporary restraining order and preliminary injunction. Defendant, Janssen, moved to quash service of process and further moved to dismiss the complaint, arguing lack of personal jurisdiction, failure to join indispensable parties, improper venue, and failure to state a claim. On December 17, 2014, the Court in the underlying case, the Hon. Sam Sparks, entered an Order denying all of these motions, both Plaintiff's and Defendant's. *St. Jude Med. S.C., Inc.*, 2014 WL 7237411.

Of specific relevance to the pending discovery dispute involving Biotronik, Inc., Judge Sparks wrote, denying Janssen's motion to dismiss for failure to state a claim:

> Concerning St. Jude S.C.'s theft and threatened misappropriation of trade secrets and confidential information claims under the TUTSA, Janssen's grounds for dismissal amount to premature arguments on the merits. . . . . For instance, whether the information at issue actually constitutes trade secrets, whether St. Jude S.C. adequately protected those alleged trade secrets, whether Janssen acquired any alleged trade secrets improperly, and whether Janssen has disclosed or will disclose the alleged trade secrets are fact questions to be resolved on a full evidentiary record. St. Jude S.C.'s pleadings, however, clearly allege a cause of action under the TUTSA and satisfy Rule 12.

*Id*. at *12.

Judge Sparks denied Plaintiff's motion for a preliminary injunction on the grounds that, among other things, St. Jude S.C. had not met its burden to show a substantial likelihood of success on the merits. Relevant to the pending discovery dispute, Judge Sparks wrote:

> St. Jude S.C. has presented a large amount of evidence supporting its allegations of misappropriation. For instance, St. Jude S.C. has cited evidence in the record suggesting, among other things: (1) Janssen was unhappy at St. Jude Belgium/Netherlands as early as May 2014; (2) Janssen was in employment discussions with Biotronik prior to the Dallas Conference; (3) Janssen sent emails to herself reflecting her intent to leave St. Jude Netherlands/Belgium prior to the Dallas Conference; (4) Janssen attended the Dallas conference without disclosing her intent to leave; (5) Janssen participated in preparing and viewed the Strat Plan at the Dallas Conference; (6) Janssen was not entirely forthcoming about her

plans to leave and her negotiation timeline with Biotronik;
(7) Janssen deleted texts, phone contacts, and emails related to
Biotronik; (8) Janssen used thumb drives to download confidential
information; and (9) Janssen has a box of thumb drives at her
house potentially containing some of St. Jude's confidential
information and trade secrets.

Yet despite all of this evidence, much of which requires inferences
in Janssen's favor, there are still far too many open questions and
disputed issues of fact to conclude at this juncture St. Jude S.C. has
a substantial likelihood of success on the merits of its
misappropriation claim. While the Court appreciates there has been
limited discovery to this point, and much of what St. Jude S.C.
must establish is extremely difficult to prove, the burden still lies
with St. Jude S.C. The burden is heavy for a reason: preliminary
injunctions are a drastic measure. The severe injunction requested
by St. Jude S.C.—preventing Janssen from holding her current job
and broadly limiting duties she can perform—illustrates this truth.
The Court highlights a few, non-exhaustive examples
demonstrating the current allegations and record's failure to
establish a substantial likelihood of success.

### i. What are the specific trade secrets Janssen misappropriated?

As an initial matter, the Court is not clear on what specific trade
secrets are at issue. St. Jude S.C.'s theory is Janssen attended the
Dallas Conference and in so doing was exposed to the Strat Plan,
which constitutes trade secret information. Yet St. Jude S.C.
cannot generically claim the entire Strat Plan, which amounted to
over 500 slides, as trade secret information. Without knowing
specifically what trade secrets are at issue, the Court cannot
determine whether Janssen took these trade secrets with her when
she left for Biotronik. Indeed, the Court cannot assess whether the
information is a trade secret at all.

*Id*. at *14-15. Judge Sparks also identified unresolved issues concerning whether Plaintiff,

St. Jude S.C., or another entity affiliated with St. Jude, actually owned the trade secrets at issue,

whether Janssen acquired trade secrets by improper means, and whether there has been any

actual or threatened disclosure of trade secrets or other confidential information. *Id*. at *15-16.

Judge Sparks concluded:

> In sum, St. Jude S.C.'s allegations and evidence are sufficient to
> establish jurisdiction and state a claim upon which relief can be
> granted but are insufficient to merit an injunction, especially the
> broad injunction requested. There are simply too many questions
> and nebulous areas of dispute for the Court to conclude St. Jude
> S.C. has a substantial likelihood of success of ultimately proving
> Janssen misappropriated St. Jude S.C.'s trade secrets, and therefore
> that Janssen should be removed from her position as U.S. President
> of Biotronik and prohibited from undertaking any job duties for
> Biotronik in the area of strategic planning, pricing, marketing, or
> product development of CRM devices and products.

*Id*. at *17.

## C. Plaintiff's Rule 45 Subpoena to Biotronik, Inc.

On December 22, 2014, five days after Judge Sparks issued his decision in Texas,

Plaintiff served a subpoena *duces tecum* under Fed. R. Civ. P. 45 on third-party Biotronik, Inc.

Although Plaintiff's subpoena was directed to and served on Biotronik, Inc., its instructions

included the following definitions, among others:

> 1.      "You," "your," or "Biotronik" means Biotronik, Inc., as
> well as any current or former employees, officers, directors,
> executives, agents, members, attorneys, investigators, consultants,
> individual contractors, corporate parent, subsidiaries or affiliates
> and other persons or entities acting or purporting to act on your
> behalf or for your benefit, whether authorized to do so or not,
> including with respect to employment discussions and negotiations
> with Ms. Janssen, Biotronik SE & Co. KG, Biotronik AG,
> Mr. Max Schaldach, Mr. Werner Braun, Mr. Christoph Boehmer,
> and Mr. Christian Bluemel.

> 2.      "Plaintiff'' or "St. Jude" means Plaintiff St. Jude Medical
> S.C., Inc. and all of its parent company and global affiliates, as
> well as any current or former employees, officers, directors,
> executives, agents, members, attorneys, investigators, consultants,
> individual contractors, and other persons acting or purporting to act
> on St. Jude's behalf or for its benefit, whether authorized to do so
> or not.

Dkt. 4-1, at 5 (Exhibit A).

Plaintiff's subpoena requested 31 separate categories of materials to be produced. Several of these categories relate to communications between Defendant Janssen and Biotronik leading up to her decision to leave her position at St. Jude Belgium/Netherlands to become President for U.S. operations at Biotronik, Inc., as well as materials within the group of Biotronik entities relating to its decision to hire Janssen. In addition, a number of requests call for production of materials that would appear, at least potentially, to involve Biotronik's trade secrets or other competitively sensitive information. Examples of these requests include:

> 1.    All documents, files, or data received or obtained directly or indirectly from St. Jude, including all documents, files, or data copied from any St. Jude computer, database, or other file-storage medium from January 1, 2014 to present.

> * * *

> 15.    All documents constituting, referring or relating to any Biotronik strategic plan, including documents used to communicate Biotronik's goals related to pricing strategy, targeted customers, marketing strategy, product roll out timetable, budget, planned design projects, organizational changes, and headcount, the actions needed to achieve those goals, and all of the other critical elements developed during any strategic planning exercise from January 1, 2013 through the present.

> 16.    All documents constituting, referring or relating to any Biotronik sales and marketing plans from January 1, 2013 through the present.

> 17.    All documents constituting, referring, or relating to Ms. Janssen's statements, contributions, or guidance relating to any discussion of Biotronik strategic plans, and sales and marketing plans, from January 1, 2014 through the present.

> 18.    Documents sufficient to show Biotronik's sales revenue and units, by product and by month, from January 1, 2013 to present.

> 19.    Documents sufficient to show the identity of any new customers Biotronik has solicited from May 1, 2014 through the present.

PAGE 9 – OPINION AND ORDER

20.    Documents sufficient to show the identity of any new customers Biotronik has gained from May 1, 2014 through the present.

21.    Documents referring or relating to St. Jude from May 1, 2014 through the present.

* * *

27.    All documents referring or relating to Biotronik's opening of any business location in New York.

Dkt. 4-1, at 11-12 (Exhibit A). Further, two other categories of demands in the third-party subpoena issued by St. Jude S.C. request Biotronik to:

30.    Make available for inspection and copying all electronic devices, including mobile phones, mobile communications devices, computers, and tablets used by Ms. Janssen.

31.    Make available for inspection and copying all flash drives, writable, removable media, or other data storage devices that Ms. Janssen has accessed or used.

Dkt. 4-1, at 12 (Exhibit A). These latter two categories also appear potentially to involve Biotronik's trade secrets or other competitively sensitive information.

One of the objectives of St. Jude S.C. in seeking to discover the materials described in its third-party subpoena to Biotronik, Inc. is to obtain evidence to support St. Jude S.C.'s claim that Janssen has misappropriated Plaintiff's trade secrets or other confidential information and is using them for the benefit of her new employer, Biotronik, Inc. St. Jude S.C. recognizes that its requests may involve the disclosure of some of Biotronik's trade secrets, but St. Jude S.C. notes that discovery in the underlying case in Texas is subject to a protective order. As shown by St. Jude S.C., the applicable Confidentiality and Protective Order includes four groups of designations. They are: (1) Nonclassified Information; (2) Classified Information; (3) For Counsel or Attorneys Only; and (4) Ultrasensitive Information. Dkt. 4-2, at 74-82 (Exhibit K). St. Jude S.C. maintains that any trade secrets or other confidential information belonging to any

of the Biotronik group of entities are appropriately protected by the Confidentiality and

Protective Order entered in the underlying case.

## STANDARDS

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides in relevant part:

> Parties may obtain discovery regarding any nonprivileged matter
> that is relevant to any party's claim or defense—including the
> existence, description, nature, custody, condition, and location of
> any documents or other tangible things and the identity and
> location of persons who know any discoverable matter. For good
> cause, the court may order discovery of any matter relevant to the
> subject matter involved in the action. Relevant information need
> not be admissible at the trial if the discovery appears reasonably
> calculated to lead to the discovery of admissible evidence. All
> discovery is subject to the limitations imposed by
> Rule 26(b)(2)(C).

Fed. R. Civ. P. 26(b)(1).[2] Among the limitations stated in Rule 26(b)(2)(C) is the direction that

the court must limit the extent of discovery if it determines that "the burden or expense of the

proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in

controversy, the parties' resources, the importance of the issues at stake in the action, and the

importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(iii). This is

known as the "rule of proportionality."

Rule 45 of the Federal Rules of Civil Procedure allows a party in a lawsuit to serve a

subpoena on any person, including a non-party (or "third party"), requiring, among other things,

the production of "documents, electronically stored information, or tangible things in that

---

[2] The Judicial Conference of the United States recently approved several significant
proposed changes to the Federal Rules of Civil Procedure, including changes to Rule 26(b).
These proposed changes are pending before the United States Supreme Court, which has until
May 1, 2015, to decide whether to forward the proposed changes to Congress. 28 U.S.C.
§ 2074(a). If forwarded by the Supreme Court, the proposed changes will become effective seven
months later, December 1, 2015, unless Congress acts to the contrary. *Id.* The Court's ruling on
the pending discovery motion is based on the rules that are now in effect.

person's possession, custody, or control." Fed. R. Civ. P. 45(a)(1)(A)(iii). When the subpoena

requires a person to disclose "a trade secret or other confidential research, development, or

commercial information," the court for the district where compliance is required may quash or

modify the subpoena. Fed. R. Civ. P. 45(d)(3)(B)(i).

In addition, the court must quash or modify a subpoena that "subjects a person to undue

burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). What constitutes an "undue burden" is the same when a

nonparty is subpoenaed under Rule 45 as when a party receives a request for production under

Rule 34. *Mount Hope Church v. Bash Back!*, 705 F.3d 418, 429 (9th Cir. 2012) ("[W]e will not

read 'undue burden' differently just because a non-party was subpoenaed.").[3] Because the "rule

of proportionality" concerns the scope of discovery generally, *see* Rule 26(b)(2)(C)(iii), it applies

both to Rule 34 requests to parties and to Rule 45 subpoenas to non-parties.

## DISCUSSION

Biotronik, Inc. offers three arguments in opposition to St. Jude S.C.'s motion to compel.

Biotronik, Inc. argues that, as a non-party, it may not be compelled to produce documents or ESI

held by its foreign affiliates on the grounds that Biotronik, Inc. does not have possession,

---

[3] Biotronik, Inc. relies on *Dart Industries Co. v. Westwood Chem. Co.*, 649 F.2d 646, 649 (9th Cir. 1980), for the proposition that in the Ninth Circuit discovery is evaluated differently when a nonparty is involved. Biotronik, Inc. quotes a statement from that case: "[t]here appear to be quite strong considerations indicating that discovery would be more limited to protect third parties from harassment, inconvenience, or disclosure of confidential documents." *Id.* That statement, however, is a quote from the District of South Carolina, and is cited by the Ninth Circuit in support of the proposition that "[w]hile discovery is a valuable right and should not be unnecessarily restricted, the 'necessary' restriction *may* be broader when a nonparty is the target of discovery." *Id.* (emphasis added) (quotation marks and citation omitted). The Ninth Circuit discusses various authorities and ultimately concludes that "[t]he district judge did not abuse his discretion in not invoking the policy favoring liberal discovery to defeat an unambiguous agreement for which Dart paid substantial consideration." *Id.* at 650. *Dart Industries* evaluated a factually-specific discovery dispute and held that under those facts, the district court did not abuse its discretion. The Court does not read *Dart Industries* as proclaiming a broad rule that nonparty discovery is evaluated differently, and *Mount Hope Church* affirms that in the Ninth Circuit, undue burden is not read differently for nonparties.

PAGE 12 – OPINION AND ORDER

custody, or control over those documents or ESI. Biotronik, Inc. also argues that St. Jude S.C. should be required to describe with greater particularity its alleged trade secrets that are at issue in the underlying litigation before St. Jude S.C. may proceed with discovery. In a related point, Biotronik, Inc. asserts that St. Jude S.C.'s subpoena is premised on "unspecified trade secrets that it may not even own." Finally, Biotronik, Inc. argues that it has produced all discoverable documents in its possession based on what it contends has been a sufficient search of relevant sources. Each of Biotronik, Inc.'s three arguments is addressed in turn.

**A.  Whether Biotronik, Inc. Must Produce Documents Held by Its European Affiliates**

"The Federal Rules of Civil Procedure require a party served with a subpoena for records to produce those records that are in its 'possession, custody, or control.'" *In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999) (quoting Fed. R. Civ. P. 45(a)). Because this requirement is in the disjunctive, actual possession of a document need not be established. Legal ownership of a document also need not be shown. *In re Bankers Trust Co.*, 61 F.3d 465, 469 (6th Cir. 1995). Control is sufficient. *Citric Acid*, 191 F.3d at 1107.

"Control is defined as the legal right to obtain documents upon demand." *Id*. (quotation marks omitted). Thus, a corporate party may be ordered to produce documents held by a subsidiary that is not a party to the action on the grounds that such documents are subject to the "effective control" of the parent. *United States v. Faltico*, 586 F.2d 1267, 1270 (8th Cir. 1978). Even documents held by a parent company have been held to be within the "control" of a subsidiary when there is a sufficiently "close nature" in the actual corporate relationship. *Japan Halon Co. v. Great Lakes Chem. Corp.*, 155 F.R.D. 626, 627 (N.D. Ind. 1993). "The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them." *Afros S.P.A. v.*

*Krauss-Maffei Corp.*, 113 F.R.D. 127, 129 (D. Del. 1986).[4] In addition, "'[c]ontrol' may be

established by the existence of a principal-agent relationship." *Allen v. Woodford*, 2007

WL 309945, at *2 (E.D. Cal. Jan. 30, 2007).[5] In short,

> "Legal right" is evaluated in the context of the facts of each case.
> *In re Folding Carton Antitrust Litig.*, 76 F.R.D. 420, 423 (D.
> Ill. 1977). The determination of control is often fact specific.
> Central to each case is the relationship between the party and the
> person or entity having actual possession of the document. *Estate
> of Young v. Holmes*, 134 F.R.D. 291, 294 (D. Nev. 1991).

*Id.*

The fact-specific question presented here is whether documents and ESI held by

Biotronik, Inc.'s sister company Biotronik SE, their common parent MS Holding II SE, or

another related Biotronik entity are within the effective control of Biotronik, Inc. St. Jude S.C.

has presented evidence that Defendant Janssen negotiated with and received her job offer to

become Biotronik, Inc.'s President of U.S. operations from Max Schaldach, the beneficial owner

of the entire "Biotronik Group," which is defined in paragraph 6 of Janssen's Employment

Agreement as "Biotronik and all of its Affiliated Companies." Also participating in the

negotiations with Janssen were Christian Bluemel (another high-level executive) and Werner

Braun, both of whom are associated with the Biotronik Group's European affiliates. As a result

of these negotiations, Janssen was appointed Biotronik, Inc.'s President for U.S. operations, in a

---

[4] As with "undue burden," there is no meaningful difference between the phrase
"possession, custody, or control" when used in the context of a request for production made to a
party under Fed. R. Civ. P. 34(a)(1) and when used in the context of a subpoena directed to a
non-party under Fed. R. Civ. P. 45(a)(1). *See generally Mount Hope Church*, 705 F.3d at 429.

[5] *See also MGA Entm't, Inc. v. Nat'l Prods. Ltd*., 2012 WL 182158, at *6 (C.D. Cal.
Jan. 23, 2012) (rejecting argument that third-party contracting agent's placement of defendant's
agreements in his own files without sending them to defendant placed such documents outside of
defendant's control); *Hitachi, Ltd. v. AmTRAN Tech. Co*., 2006 WL 2038248, at *2 (N.D. Cal.
July 18, 2006) (compelling Hitachi to produce documents held by its third party agent in license
agreement negotiations).

new office specifically created for her in New York City, replacing Biotronik, Inc.'s then-President, who was placed in another position with one of the Biotronik Group's European affiliates.

Janssen has admitted that she intentionally deleted all of her copies of her emails and text messages related to her negotiations that led to her becoming President of Biotronik, Inc. When St. Jude demanded copies of those emails, text messages, and related documents from Biotronik, Inc., however, all that was produced was a redacted copy of Janssen's final contract and several pages from her passport and visa application. In addition, Biotronik, Inc. has refused to search the documents or ESI of any of Biotronik, Inc.'s European affiliates, including the files of Messrs. Schaldach, Bluemel, and Braun, with whom Janssen negotiated her move and new employment, on the grounds that the European affiliates are distinct legal entities and that those individuals are not employed by Biotronik, Inc., but only by its European affiliates.

St. Jude S.C. argues that because no documents reflecting any negotiations with Janssen were produced by Biotronik, Inc., a reasonable inference is that the negotiations with Janssen, which she admits took place, were carried out in Europe by Biotronik, Inc.'s European affiliates, including Messrs. Schaldach, Bluemel, and Braun, acting as agents for Biotronik, Inc. Because Biotronik, Inc. is Janssen's actual employer in the United States, St. Jude S.C.'s agency argument is well taken.

A corporation "can only act through its employees, agents, directors, or officers." 9th Cir. Civ. Jury Instruction 4.2 (2007). The negotiations that led to Biotronik, Inc. hiring Janssen in 2014 as its President for U.S. operations presumably were not conducted by any of its own employees, directors, or officers because, if they were, one would reasonably have expected to find some documentary or ESI evidence to that effect. But Biotronik, Inc. says that it conducted

a reasonable search and has found none. Biotronik, Inc. also does not argue that any of its employees, directors, or officers handled its side of the employment negotiations with Janssen. Thus, it is reasonable to infer that the persons associated with Biotronik, Inc.'s European affiliates, including Messrs. Schaldach, Bluemel, and Braun, who negotiated Janssen's hiring by Biotronik, Inc., were acting as agents for Biotronik, Inc., Janssen's actual new employer. This is sufficient indicia of effective control to require the European affiliates of Biotronik, Inc., namely the "Biotronik Group" as defined in Janssen's Employment Agreement, to conduct a reasonable and diligent search for documents and ESI responsive to St. Jude S.C.'s Rule 45 subpoena served on Biotronik, Inc.

## B. Whether Plaintiff Must First Disclose Its Trade Secrets with Greater Particularity

Biotronik, Inc. also argues that "[u]nder the great weight of authority, St. Jude should be required to disclose its alleged trade secrets at issue in this case before it can proceed with discovery." Biotronik, Inc. cites several district court cases in support of this proposition, beginning with *United Servs. Auto. Ass'n v. Mitek Sys., Inc.*, 289 F.R.D. 244, 248 (W.D. Tex. 2013), *aff'd*, 2013 WL 1867417 (W.D. Tex. Apr. 24, 2013) (noting that "[a] number of states have enacted procedures requiring that trade secrets be identified before discovery commences" in granting a defendant's motion for pre-discovery identification of trade secrets). In that case, the court also expressly noted that "neither Texas nor Fifth Circuit law requires Pre-Discovery Identification," although the court found the general authority to do so in any particular case in Federal Rule of Civil Procedure 16(c)(2)(L) (allowing a court to adopt special procedures for managing potentially difficult or protracted actions). *Id*. In the underlying case here pending in federal court in Texas, and in which Plaintiff alleges a violation of the Texas Uniform Trade Secrets Act, Defendant Janssen did not ask Judge Sparks to require Plaintiff to define further its

alleged trade secrets before being allowed to proceed with discovery, even though Janssen filed

numerous other motions before Judge Sparks, all of which were denied.

Biotronik, Inc. cites several other cases for the same proposition. *See, e.g.*, *DeRubeis v.*

*Witten Techs., Inc.*, 244 F.R.D. 676, 680-81 (N.D. Ga. 2007) (weighing the policy considerations

for discovery where trade secret misappropriation has been alleged and concluding "that it is

appropriate in this case to require [the plaintiff] to first identify with 'reasonable particularity'

those trade secrets it believes to be at issue"); *Switch Commc'ns Grp. v. Ballard*, 2012

WL 2342929, at *5 (D. Nev. June 19, 2012) (holding that a defendant was not required to

respond to the plaintiff's discovery requests until the plaintiff "provides a description of its

alleged trade secrets with reasonable particularity"); *StoneEagle Servs., Inc. v. Valentine*, 2013

WL 9554563, at *5 (N.D. Tex. June 5, 2013) (noting that "[r]equiring Plaintiffs to provide a list

of trade secrets at issue, defined with reasonable particularity, would be helpful to Plaintiffs as

well" and holding that it must be done before the plaintiffs would be permitted to conduct

discovery); *BioD, LLC v. Amnio Tech., LLC*, 2014 WL 3864658, at *5-6 (D. Ariz. Aug. 6, 2014)

(same).

On the other hand, St. Jude S.C. cites several cases in which the court declined to require

the plaintiff to identify its alleged trade secrets before being allowed to conduct discovery. *See,*

*e.g.*, *Global Advanced Metals USA, Inc. v. Kemet Blue Powder Corp.*, 2012 WL 3884939, at *7

(D. Nev. Sept. 6, 2012) (affirming magistrate judge's decision not to require the plaintiff to

identify its trade secrets "because of their voluminosity" and noting that "a listing of every trade

secret would draw an objection from Defendant that they must be narrowed, leading to additional

discovery disputes and delays, and that a protective order against disclosure would protect

Defendant's interests"); *Montgomery v. eTreppid Techs., LLC*, 2008 WL 2277118, at *10-11 (D.

Nev. May 29, 2008) (permitting eTreppid to take discovery on its trade secret counterclaim against Montgomery without first specifically identifying its own trade secrets at issue).

One relatively recent case cited by Biotronik, Inc. is particularly instructive for identifying the criteria that a district court should consider in deciding this question. In *BioD*, the court noted:

> [d]etermining whether a trade secret has been misappropriated usually involves examining things that the other party considers its own trade secrets. There is no privilege excepting trade secrets from discovery, but courts must exercise discretion to avoid unnecessary disclosures of such information. [P]laintiff will normally be required first to identify with reasonable particularity the matter which it claims constitutes a trade secret, before it will be allowed (given a proper showing of need) to compel discovery of its adversary's trade secrets.

*BioD*, 2014 WL 3864658, at *4 (alterations in original) (quoting *Dura Global Technologies, Inc. v. Magna Donnelly, Corp.*, 2007 WL 4303294, at *2 (E.D. Mich. Dec. 6, 2007). The Court in *BioD* continued, however, by observing:  "A plaintiff also might not be required to identify its trade secrets with reasonable particularity prior to discovery." *Id.* at *5. As explained by the court:

> [C]ourts have identified at least three policies which support allowing the trade secret plaintiff to take discovery prior to identifying its claimed trade secrets. First, courts have highlighted a plaintiff's broad right to discovery under the Federal Rules of Civil Procedure. Second, the trade secret plaintiff, particularly if it is a company that has hundreds or thousands of trade secrets, may have no way of knowing what trade secrets have been misappropriated until it receives discovery on how the defendant is operating. Finally, if the trade secret plaintiff is forced to identify the trade secrets at issue without knowing which of those secrets have been misappropriated, it is placed in somewhat of a "Catch-22" [because] [i]f the list is too general, it will encompass material that the defendant will be able to show cannot be trade secret. If instead it is too specific, it may miss what the defendant is doing.

*Id.* (alterations in original) (quoting *DeRubeis*, 244 F.R.D. at 680).

PAGE 18 – OPINION AND ORDER

Applying these considerations here, St. Jude S.C. need not identify its trade secrets at issue with any greater particularity before it may take discovery from Biotronik, Inc. and its European affiliates to determine what precisely Defendant Janssen took and whether she is using it improperly for the benefit of her new employer. First, Plaintiff has a broad right to discovery, and the federal court in the underlying case has not chosen to limit Plaintiff's ability to commence discovery, notwithstanding that court's comments about Plaintiff's allegations of the trade secrets it alleges have been stolen. Second, Plaintiff appears to have numerous trade secrets but, to quote *BioD*, "no way of knowing what trade secrets have been misappropriated until it receives discovery on how the defendant is operating." *Id.* at *5. Finally, requiring St. Jude S.C. to identify its trade secrets without first knowing which have been misappropriated by Janssen and placed into use at Biotronik, Inc. or its European affiliates would place Plaintiff, again to quote *BioD*, "in somewhat of a 'Catch-22.'" *Id.*

## C.  Whether the Court Should Appoint a Special Master for Third-Party Discovery

Biotronik, Inc.'s final objection, or set of objections, is that it already has produced (or will soon produce) all discoverable documents in its possession based on what it contends is a sufficient search of relevant sources. Biotronik, Inc. has identified for Plaintiff and the Court the specific search terms that Biotronik, Inc. either has searched or soon will search for responsive documents and ESI and the custodians whose ESI will be searched. There is no agreement, however, with St. Jude S.C. that such search terms, search parameters, or identified custodians are sufficient. In addition, Biotronik, Inc., in its appendix to its memorandum in opposition to St. Jude S.C.'s motion to compel, has identified numerous specific objections to St. Jude S.C.'s 31 specific requests. In its objections to many of St. Jude S.C.'s requests, Biotronik, Inc. asserts that the request is overly broad or seeks information that is not relevant or calculated to lead to the discovery of admissible evidence. Rather than address each of these specific

objections, the parties focused their briefing and their time at oral argument on the two primary issues previously discussed in this Opinion and Order. Now that those issues have been resolved, it is time to address Biotronik, Inc's specific objections.

Doing that, however, requires someone to become quite familiar with the underlying technologies, businesses and business affiliations, global markets and marketing strategies, and the specific document retention and ESI practices at issue. This will also require more time than this Court (or a Magistrate Judge in this District) currently has available, if the parties are to receive a speedy and timely resolution of their pending discovery dispute, upon which a large part of the underlying lawsuit appears to hinge.[6] In part for this reason, Rule 53 allows for the appointment of a master, including a special master to supervise discovery, including ESI. Fed. R. Civ. P. 53; *see also* Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION § 11.52 (4th ed. 2004); Academy of Court-Appointed Masters, APPOINTING SPECIAL MASTER AND OTHER JUDICIAL ADJUNCTS: A HANDBOOK FOR JUDGES AND LAWYERS (2d ed. 2009). Before appointing a special master, however, the Court "must consider the fairness of imposing the likely expenses on the parties and must protect against unreasonable expense or delay." Fed. R. Civ. P. 53(a)(3). The Court has done so here.

In addition, before appointing a special master, the Court also must give the parties notice and an opportunity to be heard. Fed. R. Civ. P. 53(b)(1). During the oral argument held on St. Jude S.C.'s motion to compel, Biotronik, Inc. itself suggested that the Court appoint a special master for this purpose. Tr. 37:17 (Hearing on March 17, 2015). The Court was already thinking along similar lines and during the hearing asked St. Jude S.C. for its position, which St. Jude S.C.

---

[6] The Court is mindful that the Federal Rules of Civil Procedure direct that they "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. Sometimes, however, these principles can conflict.

agreed to provide within two days. On March 19, 2015, St. Jude S.C. indicated that it had no

objection to the appointment of a special master for purposes of third-party discovery against

Biotronik, Inc. *See* Dkt. 17. Moreover, neither party objects to the specific candidate suggested

by the Court for this purpose. *Id.*; Tr. 38:10-15 (Hearing on March 17, 2015). Accordingly, the

Court, by separate Order, will appoint a special master for purposes of assisting the Court and the

parties, including Third-Party Biotronik, Inc., in resolving the remainder of the discovery dispute

presented in St. Jude S.C.'s motion to compel Biotronik, Inc. to comply with Plaintiff's

third-party subpoena and Biotronik, Inc.'s specific objections as stated in its response.

## CONCLUSION

Plaintiff's Motion to Compel Biotronik, Inc. to Comply with Third-Party Subpoena

(Dkt. 4) is granted in part, as set forth in this Opinion and Order. In a separate Order, the Court

will appoint a special master to assist in addressing the unresolved portions of the pending

discovery dispute.

**IT IS SO ORDERED**.

DATED this 23rd day of March, 2015.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge