# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ST. JUDE MEDICAL S.C., INC.**, | Case No. 3:15-mc-00099-SI |
| Plaintiff, | **OPINION AND ORDER ON MOTION FOR RECONSIDERATION OR TRANSFER** |
| v. | |
| **LOUISE MARIE JANSSEN-COUNOTTE**, | (Principal case pending in U.S. District Court, Western District of Texas, Austin Div., Case No. A-14-CA-877-SS) |
| Defendant, | |
| and | |
| **BIOTRONIK, INC.**, | |
| Third-Party Subpoena Recipient. | |

Paul A. C. Berg, COSGRAVE VERGEER KESTER LLP, 888 S.W. Fifth Avenue, Suite 500, Portland, OR 97204; Stephen M. Nickelsburg and Roni Bergoffen, CLIFFORD CHANCE US LLP, 2001 K Street NW, Washington, DC 20006. Of Attorneys for Plaintiff.

E. Sean Donahue, DONAHUE & ASSOCIATES, One S.W. Columbia Street, Suite 1625, Portland, OR 97258-2021; Ned H. Bassen, HUGHES HUBBARD & REED LLP, One Battery Park Plaza, New York, NY 10004. Of Attorneys for Third-Party Subpoena Recipient Biotronik, Inc.

No appearance was entered by Defendant Louise Marie Janssen-Counotte.

**Michael H. Simon, District Judge.**

Plaintiff St. Jude Medical S.C., Inc. ("St. Jude" or "St. Jude U.S.") previously brought a motion to compel compliance with a third-party subpoena that it served upon Biotronik, Inc. ("Biotronik" or "Biotronik U.S."). After that motion was fully briefed and argued, the Court granted St. Jude's motion in part and appointed a special master to assist in resolving the remainder of the issues. Dkts. 19, 20. Biotronik now moves the Court to reconsider its decision or to transfer the dispute to the Western District of Texas, where the underlying, principal case is pending. The Court has considered the parties' arguments as set forth in their memoranda and supporting materials. For the reasons stated below, Biotronik's motion is DENIED.

## BACKGROUND

The parties and events leading to the present motion are adequately chronicled in the Court's prior Opinion and Order dated March 23, 2015. Dkt. 19 at 2-11. For ease of understanding the Court's resolution of the pending motion, however, the parties and their relationships relevant to this motion are briefly stated as follows:

- St. Jude U.S. and Biotronik U.S. are both members of multinational corporate groups that compete in the worldwide medical-technology market.

- Biotronik U.S. is owned by MS Holding II SE, a German company. MS Holding II SE also owns Biotronik SE & Co. KG ("Biotronik SE"), a German company. Biotronik AG is another European company affiliated with Biotronik U.S.

- Defendant Louise Marie Janssen-Counotte ("Janssen") was previously employed as a vice president by St. Jude U.S.'s European affiliates and is now president of Biotronik U.S.

- The "Biotronik Group," as defined in Janssen's employment agreement, includes Biotronik U.S. and all of its affiliated companies, including Biotronik SE, Biotronik AG, and MS Holding II SE.

- Max Schaldach is the beneficial owner of the entire Biotronik Group. Christian Bluemel and Werner Braun are also high-level executives of companies within the Biotronik Group. Janssen negotiated her employment by Biotronik U.S. with Messrs. Schaldach, Bluemel, and Braun.

## DISCUSSION

Biotronik argues that the Court erred on two counts: first, in holding that Biotronik U.S. had "control," within the meaning of Rule 45 of the Federal Rules of Civil Procedure, over certain documents held by its European affiliates; and second, in permitting St. Jude to proceed with its third-party subpoena without disclosing which particular trade secrets it alleges were stolen. Biotronik also invokes for the first time the application of the Hague Convention on the Taking of Evidence in Civil or Commercial Matters ("Hague Evidence Convention" or "Convention"), *opened for signature* March 18, 1970, 23 U.S.T. 2555. Finally, despite having litigated the merits of this discovery dispute in this Court and not having previously consented to this discovery dispute being heard by the court presiding over the principal case, Biotronik now moves to transfer this discovery dispute to the Western District of Texas after having lost on the merits of most of its arguments.

## A.  Rule 45 and the Meaning of "Control"

In its motion for reconsideration, Biotronik argues that, among other things, the Court misapplied the Ninth Circuit's standard in *In re Citric Acid Litigation*, 191 F.3d 1090 (9th Cir. 1999), for when a corporate entity has "control" over documents that are owned by and in the possession of a legally distinct entity. According to Biotronik,

PAGE 3 – OPINION AND ORDER

> In *Citric Acid*, the Ninth Circuit ruled that a party lacks legal
> control over documents in the possession of an affiliated entity
> where the affiliates in question are separate entities under the law
> and any contract governing the parties' relationship does not
> expressly give the subpoenaed party the right to obtain the records
> upon demand. 191 F.3d at 1107 (discussing *United States v.
> International Union of Petroleum & Indus. Workers*, 870 F.2d
> 1450, 1452 (9th Cir. 1989)).

Dkt. 25 at 9. Biotronik adds that "[t]he Court here did not apply this standard" and that "[t]he

facts of *Citric Acid* are remarkably similar to those present here." *Id*. at 9-10.

Biotronik is incorrect on both points. The Court correctly applied the Ninth Circuit's

standard in *Citric Acid*, and the facts of that case are not relevantly similar to the present dispute.

Indeed, it is this factual distinction that explains how this Court correctly applied the *Citric Acid*

standard yet arrived at a different result. In short, *Citric Acid* involved a contractual relationship

among affiliated entities and the parties' contract did not provide that one party had the right to

control documents owned by the other. There was no agency relationship alleged in *Citric Acid*.

In relevant contrast here, St. Jude has shown that a principal-agent relationship exists here, and it

is a basic premise of the law governing principal-agent relations that an agent must comply with

the lawful directives of the principal concerning matters within the agency relationship. Thus, the

case pending before this Court involving St. Jude and Biotronik, unlike *Citric Acid*, does present

the "right to control" documents owned by another (namely, the agent of the subpoenaed party)

and thereby satisfies the control requirement set forth in *Citric Acid*.

In *Citric Acid*, the Ninth Circuit addressed whether the district court abused its discretion

in denying a plaintiff's motion to compel third party Coopers & Lybrand LLP ("C&L-US") to

produce various documents in the possession of an autonomous but affiliated firm Societe

Fidciare Suisse Coopers & Lybrand ("C&L-Switzerland"). Both C&L-US and C&L-Switzerland

were members of C&L International, an association organized under the laws of Switzerland

consisting of member accounting firms throughout the world. Although the members share "Coopers & Lybrand" in their names, they were legally distinct and autonomous entities. *Citric Acid*, 191 F.3d at 1106. C&L-Switzerland apparently had some connection with the European Citric Acid Manufacturers Association ("ECAMA"), a European trade association that the plaintiffs alleged was used by the defendant and its worldwide competitors as a vehicle for conducting illegal international price-fixing. *Id.* at 1097. One of the plaintiffs served C&L-US with a subpoena to produce both documents in its possession and documents in the possession of C&L-Switzerland. C&L-US produced documents in its possession, sent a letter to C&L-Switzerland asking entity to produce responsive documents in its possession, and C&L-Switzerland declined. The plaintiff moved to compel C&L-US to produce documents held by C&L-Switzerland, and the district court denied the motion, finding that C&L-US lacked legal control over documents held by C&L-Switzerland. The plaintiff appealed to the Ninth Circuit (along with the plaintiff's appeal of the district court's order granting summary judgment to the defendant). The Ninth Circuit affirmed both the grant of summary judgment and the denial of the motion to compel. *Id.* at 1107-1108. The plaintiff raised no allegation and presented no evidence that C&L-Switzerland had acted as an agent for C&L-US in performing any relevant work for ECAMA. Thus, no "agency" issues were raised in *Citric Acid.*

In affirming the district court's denial of the plaintiff's motion to compel, the Ninth Circuit noted that the text of Rule 45 requires a party served with a subpoena for records to produce only those records that are in its "possession, custody, or control." *Id.* at 1107. Following earlier precedent, the Ninth Circuit said: "Control is defined as the legal right to obtain documents upon demand." *Id.* at 1107 (quoting *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989) ("*IUPIW*")). In discussing

*IUPIW*, the Ninth Circuit in *Citric Acid* noted that in that case "[t]he court concluded that IUPIW lacked legal control over documents in the possession of local unions because IUPIW and each local union were separate entities under the law and because the contract governing the union relationship did not expressly give IUPIW the right to obtain the records of local unions upon demand." *Id.* at 1107. As in *Citric Acid*, there was no discussion in *IUPIW* of any potential principal-agency relationship among the national union and the local unions.

Thus, the Ninth Circuit in *Citric Acid* only considered "control" in the context of a contractual relationship among entities when there was no allegation of any agency relationship. Moreover, the Ninth Circuit in *IUPIW* observed in *dicta* that "[a] corporation must produce documents possessed by a subsidiary that the parent corporation owns or wholly controls." *IUPIW*, 870 F.2d at 1452. In expressing that observation, there was no analysis of any specific contractual terms that might allow the parent to assert control over the documents owned by its subsidiary corporation. In addition to this comment, there are numerous cases that hold that a parent corporation has "control" over documents owned by a wholly-owned subsidiary—even without any explicit analysis of specific contractual terms.

Moreover, there are numerous cases that hold that "control," for purposes of document discovery under the Federal Rules of Civil Procedure, "may be established by the existence of a principal-agent relationship." *See, e.g., Rosie v. Romney*, 256 F. Supp. 2d 115, 119 (D. Mass. 2003) (citing cases); *see also Allen v. Woodford*, 2007 WL 309945, at *2 (E.D. Cal. 2007) ("'Control' may be established by the existence of a principal-agent relationship."). This is also entirely consistent with the common law governing the principal-agent relationship. *See* Restatement (Third) of Agency § 8.09(2) (2005) ("An agent has a duty to comply with all lawful instructions received from the principal and persons designated by the principal

PAGE 6 – OPINION AND ORDER

concerning the agent's actions on behalf of the principal."); *see also* RESTATEMENT (THIRD) OF AGENCY § 8.11 (discussing an agent's duty to use reasonable effort to provide the principal with facts that the agent knows).

The burden is on the party seeking the production of documents to prove that the opposing or subpoenaed party has the requisite control. *IUPIW*, 870 F.2d at 1452. Here, St. Jude has satisfied its burden by showing that Messrs. Schaldach, Bluemel, and Braun acted as agents for Biotronik, Inc. when they negotiated and reached agreement with Defendant Janssen to have Ms. Janssen leave her position with St. Jude in Europe to become the president of Biotronik, Inc. (Biotronik U.S.) in the United States. *See* Opinion and Order (Dkt. 19) at 15-16.

This does not necessarily mean that every entity European affiliate in the "Biotronik Group" is an agent of Biotronik, Inc. The agency relationship likely goes only so far as the specific Biotronik entities associated with Messrs. Schaldach, Bluemel, or Braun. For example, if a specific entity within the Biotronik Group had absolutely no connection with any of these three individuals, or with anyone else negotiating with Ms. Janssen for her to become president of Biotronik, Inc., then St. Jude would not have met its burden of showing that this specific entity was an agent of Biotronik, Inc. This issue, however, is likely to be more theoretical than it is real because Mr. Schaldach is the beneficial owner of the entire Biotronik Group. *Id*. at 14. Thus, responsive documents concerning or involving Ms. Janssen's hiring away from St. Jude to work as president of Biontronik, Inc., including communications among or involving Messrs. Schaldach, Bluemel, or Braun, must be produced to St. Jude, regardless of which specific affiliate within the Biotronik Group they may be located or found. In the first instance, at least, the special master shall attempt to resolve any remaining problems or details arising under this issue.

PAGE 7 – OPINION AND ORDER

**B.  Disclosure of Trade Secrets Before Discovery**

Biotronik also argues in its motion for reconsideration that the Court misapplied the law in determining that St. Jude did not have to identify further its trade secrets before proceeding under its third-party subpoena. Specifically, Biotronik asserts that the Court did not apply all of the relevant factors described in *BioD, LLC v. Amnio Tech., LLC*, 2014 WL 3864658 (D. Ariz. Aug. 6, 2014), and *DeRubeis v. Witten Techs., Inc.*, 244 F.R.D. 676, 680-81 (N.D. Ga. 2007). Biotronik is mistaken. The Court considered and weighed all of the factors and discussed in its Opinion and Order only those that the Court considered most relevant. *See* Opinion and Order (Dkt. 19) at 16-19. The Court then declined to impose Biotronik's proposed threshold.

**C.  The Hague Evidence Convention**

The taking of discovery from foreign entities in civil litigation pending in the United States federal courts is regulated by two sets of rules: the Federal Rules of Civil Procedure ("Federal Rules") and the Hague Evidence Convention. The Convention provides for certain procedures—chiefly, the "transmission and execution of Letters of Request" between the judicial authorities of contracting states—for obtaining evidence located in a state other than the forum state. Hague Evidence Convention, Preamble. As the U.S. Supreme Court has explained, however, the procedures of the Convention are a "permissive supplement, not a pre-emptive replacement, for other means of obtaining evidence located abroad." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 536 (1987). Thus, both the Federal Rules and the Convention are permissible vehicles by which a litigant in American courts may conduct civil discovery internationally. *Id.* at 545-46.

A district court has the power, however, to insist upon the use of Convention procedures to obtain evidence, just as it may regulate and restrict the conduct of discovery under the Federal Rules. *See id.* at 546. The decision whether to do so is a "delicate task of adjudication" that

depends upon "the situations of the parties before [the court]" and the concerns of international comity.[1] *Id.* at 546, 533. The Supreme Court declined to "articulate specific rules" to govern this decision, *id.* at 546, but did observe that the following factors were "relevant to any comity analysis":

> (1)  the importance to the litigation of the documents or other information requested;
>
> (2)  the degree of specificity of the request;
>
> (3)  whether the information originated in the United States;
>
> (4)  the availability of alternative means of securing the information; and
>
> (5)  the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

*Id.* at 544 n.28 (quotation marks and alterations omitted); *see also* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 442(1)(c) (1987).[2]

---

[1] The canonical description of the concept of "comity" comes from *Hilton v. Guyot*, 159 U.S. 113 (1895):

> "Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

*Id.* at 163–64. Comity, in other words, is an "imperfect obligation," and therefore "must necessarily depend upon a variety of circumstances, which cannot be reduced to any certain rule." Joseph Story, *Commentaries on the Conflict of Laws* §§ 33, 28 (1834).

[2] The Supreme Court quoted these factors from § 437 of a draft of the RESTATEMENT; in the final version, the same factors appear verbatim in § 442.

In *Richmark Corp. v. Timber Falling Consultants*, the Ninth Circuit adopted these factors to analyze "whether or not foreign [secrecy] statutes excuse noncompliance" with a discovery order. *See* 959 F.2d 1468, 1475 (9th Cir. 1992). In addition, *Richmark* introduced two more factors to consider: "the extent and the nature of the hardship that inconsistent enforcement would impose upon the person, and the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state." *Id.* (quotation marks and alterations omitted).

The *Richmark* court's analysis was *ex post*, after the foreign party had refused to comply with a discovery order. 959 F.2d at 1475. By contrast, *Aerospatiale* analyzed *ex ante* whether the discovery procedures prescribed by the Convention were mandatory or optional. *See* 482 U.S. at 524. The pending discovery dispute involving Biotronik arises in a similar *ex ante* posture. Here, Biotronik acknowledges *Aerospatiale*'s holding that the Convention procedures are optional, but argues that Germany and Switzerland have strong interests that would be undermined by permitting discovery under the Federal Rules—interests evinced in large part by German and Swiss laws that, according to Biotronik, prohibit the discovery St. Jude seeks. Biotronik argues that the Court should therefore, out of comity, require St. Jude to conduct discovery under the Convention rather than the Federal Rules. The Court analyzes Biotronik's argument using the framework from *Aerospatiale* and *Richmark*.

### 1.  National Interests

A party claiming the shelter of foreign law to avoid discovery must first show that foreign law in fact bars production. *United States v. Vetco Inc.*, 691 F.2d 1281, 1289 (9th Cir. 1981); *BrightEdge Techs., Inc. v. Searchmetrics, GmbH.*, 2014 WL 3965062, at *2 (N.D. Cal. Aug. 13, 2014). Even when such a showing is made, however, "[i]t is well settled that [foreign] statutes do not deprive an American court of the power to order a party subject to its jurisdiction

to produce evidence even though the act of production may violate that statute." *Aerospatiale*, 482 U.S. at 544 n.29. Instead, the Court must "assess the interests of each nation in requiring or prohibiting disclosure, and determine whether disclosure would 'affect important substantive policies or interests' of either the United States or [other nations]." *Richmark*, 959 F.2d at 1476 (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 442 cmt. c). The balance between the interests of the United States and those of the foreign states involved is "the most important factor" in the comity analysis. *See Richmark*, 959 F.2d at 1476. Accordingly, the Court analyzes this factor first.

The United States has a "substantial" interest in "vindicating the rights of American plaintiffs," *id.* at 1477 (quotation marks omitted), and an "overriding interest in the just, speedy, and inexpensive determination of litigation in [its] courts." *Aerospatiale*, 482 U.S. at 542-43 (quotation marks omitted). The "broad right of discovery" in American courts "is based on the general principle that litigants have a right to every man's evidence, and that wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for the truth." *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993) (quotation marks and citation omitted). The interests of the United States in permitting efficient discovery under the Federal Rules are therefore considerable and fundamental.

These interests must be weighed against the interests of foreign nations in secrecy or nondisclosure. A foreign country's strong interest in nondisclosure weighs in favor of ordering discovery to be conducted under the Convention, thereby allowing foreign judicial authorities to participate in its regulation. In evaluating the interests of foreign nations, the Court looks to "expressions of interest by the foreign state, the significance of disclosure in the regulation of the activity in question, and indications of the foreign state's concern for confidentiality prior to the

controversy." *Richmark*, 959 F.2d at 1476 (quotation marks and alterations omitted). In this interest-balancing analysis, the foreign statutes purportedly prohibiting disclosure are relevant "only to the extent that [their] terms and [their] enforcement identify the nature of the sovereign interests in nondisclosure of specific kinds of material." *Aerospatiale*, 482 U.S. at 544 n.29.

Here, Biotronik primarily argues that Germany's Federal Data Protection Law or Bundesdatenschutzgesetz ("BDSG") prohibits the discovery sought here. The BDSG implements European Union Directive 95/46/EC, 1995 O.J. (L 281) 31 ("Directive"),[3] which protects the "right to privacy [of natural persons] with respect to the processing of personal data." *Id.* art. 1(1).[4] "Personal data" is defined broadly to include names, job titles, email addresses, and so on. The Directive prohibits the "processing"—including disclosure—of personal data unless certain conditions are met. *Id.* art. 2(b), 7. In addition, the Directive prohibits the transfer of personal data to "third countries" outside the European Union except under certain conditions. *Id.* art. 25, 26.

Biotronik asserts that much of the data responsive to St. Jude's requests will be emails, text messages, and so on, and that such documents will at a minimum contain personal data identifying the sender and the recipient. Biotronik argues that producing such documents would therefore violate the BDSG, potentially exposing Biotronik's European affiliates to civil or even criminal sanctions. Biotronik's argument fails to persuade: Article 7 of the Directive provides a number of conditions under which the disclosure of personal data is permitted, at least three of which appear to be applicable here.

---

[3] Available at http://eur-lex.europa.eu/legal-content/EN/TXT/ ?uri=uriserv:OJ.L_.1995.281.01.0031.01.ENG.

[4] Biotronik's expert in German law, Dr. Detlev Gabel, asserts that Germany interprets the BDSG in accordance with the Directive and that the two may therefore be treated roughly interchangeably. *See* Dkt. 32-1 at 11. The Court accepts this proposition and does the same.

First, disclosure is permitted where it is necessary for "compliance with a legal obligation." *Id.* art. 7(c). Because this Court is ordering Biotronik to comply with the subpoena at issue, then Biotronik will be complying with a legal obligation.

Second, disclosure is permitted where it is necessary for "the performance of a task carried out . . . in the exercise of official authority vested in the controller or in a third party to whom the data are disclosed." *Id.* art. 7(e). The power to issue a subpoena, though vested in a private party, is a delegation of the official authority of the Court. *See Reiman v. Does 1-1000*, 2007 WL 1575307, at *2 (W.D. Wash. May 22, 2007) (citing *Theofel v. Farey-Jones*, 359 F.3d 1066, 1074-75 (9th Cir. 2004)).

Third, disclosure is permitted where it is necessary for "the purposes of the legitimate interests pursued by the controller or by the third party or parties to whom the data are disclosed, except where such interests are overridden by the interests for fundamental rights and freedoms of the data subject." Directive art. 7(f).[5] Biotronik has a legitimate and weighty interest in disclosure: complying with a court order. The "data subject[s]" here, by contrast, have only a *de minimis* interest in nondisclosure. In most cases, they will not be unwitting employees or customers, but high-level executives such as Schaldach, Bluemel, and Braun—individuals closely involved in the underlying litigation. Thus, their overall interests are aligned with those

---

[5] *See* Data Protection Working Party, *Working Document 1/2009 on Pre-Trial Discovery for Cross Border Litigation* 9-10 (2009) [hereinafter "WP 158"], *available at* http://ec.europa.eu/ justice/policies/privacy/docs/wpdocs/2009/wp158_en.pdf (recognizing that "[c]ompliance with the requirements of the litigation process may be found to be necessary for the purposes of a legitimate interest pursued by the controller"). The Data Protection Working Party is an "independent European advisory body on data protection and privacy" set up under Article 29 of the Directive. *Id.* at 1. WP 158 is set of advisory guidelines for European data controllers faced with cross-border litigation. *Id.* at 2.

of Biotronik;[6] and whatever privacy interest they may have in nondisclosure do not override Biotronik's interest in disclosure in order to comply with this Court's discovery orders.

With regard to the Article 25 prohibition on transfer of personal data to third countries, Article 26 similarly permits such a transfer under several circumstances. Most notably, such transfers are permitted when they are "necessary or legally required on important public interest grounds, or for the establishment, exercise or defence of legal claims." Directive art 26(1)(d). That condition is met here.

Moreover, transfer to third countries is permitted when "the third country in question ensures an adequate level of protection." *Id.* art 25(1). The United States does not, in general, provide European levels of protection for personal data.[7] But out of regard for Germany's sovereign interest in the data privacy of its citizens, and in recognition of the U.S. Supreme Court's directive that "American courts should . . . take care to demonstrate due respect for any special problem confronted by the foreign litigant," this district court directs that all documents containing personal data be restricted to attorneys' eyes only unless otherwise agreed upon by all affected parties. Further, unless otherwise agreed upon by all affected parties, if responsive documents are filed in this Court or the underlying Court, they shall be filed under seal, unless otherwise ordered by the applicable court in which such documents are filed.[8]

---

[6] *See* WP 158 at 9 (analyzing, as against a legitimate litigation interest in disclosure, the privacy interests of "the data subject who has no direct in involvement in the litigation process"). The same document discourages the use of consent as a grounds for disclosure in the litigation context *except* "where the individual is aware of, or even involved in the litigation process." *Id.*

[7] *See* Data Protection Working Party, *Opinion 1/99 Concerning the Level of Data Protection in the United States* 2 (1999), *available at* http://ec.europa.eu/justice/policies/privacy/docs/wpdocs/1999/wp15en.pdf.

[8] Biotronik states in its reply that St. Jude violated a protective order in the underlying litigation by filing with this Court certain documents relating to Janssen's employment with Biotronik. St. Jude had, however, contemporaneously moved to file several other documents

PAGE 14 – OPINION AND ORDER

Biotronik argues that "it cannot be ruled out" that a German court might ultimately construe the BDSG differently and subject Biotronik to sanctions. Biotronik mistakes the nature of the analysis. It is Biotronik's burden to demonstrate that the BDSG prohibits disclosure, and Biotronik has not met that burden.[9] Moreover, even if Biotronik had persuasively demonstrated that the BDSG prohibited disclosure, that would merely advance the analysis to the interest-balancing stage. Germany clearly has an interest in the data privacy of its citizens. But the variety of BDSG provisions permitting disclosure—several of which appear on their face to encompass disclosure under court order for litigation purposes—demonstrate that this interest is not all-consuming.

The definition of personal data under the Directive is extremely broad: "*any* information relating to an identified or identifiable natural person." Directive art. 2(a) (emphasis added). Under such a definition, almost *all* useful discovery will contain personal data. Indeed, Biotronik's own argument is that each and every email, by virtue of its "to" and "from" fields, falls under the aegis of the Directive. If the possibility of discovering "personal data" were sufficient to preclude a party from using the Federal Rules, then for discovery from European parties the Convention would in fact be a "pre-emptive replacement" for the Federal Rules. *Cf.*

---

under seal; and the same day that Biotronik filed its reply, counsel for St. Jude notified the Court that Janssen's employment documents had been inadvertently excluded from its motion and requested that the oversight immediately be corrected. Those documents have now been sealed as well. The Court is satisfied by St. Jude's prompt attention to the matter that St. Jude can adequately implement and comply with any safeguards necessary to protect private data.

[9] In a case raising similar issues in the Third Circuit, that court observed that the German parties there had not "identified a single instance where a German national has been prosecuted, penalized, or sanctioned under German law for complying with discovery orders from a United States judicial or administrative proceeding pursuant to the Federal Rules." *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 304 (3d Cir. 2004). Similarly, Biotronik has failed to supply the Court with any such examples. *Cf. Aerospatiale*, 482 U.S. at 544 n.29 (analyzing the strength of foreign interests by considering not only the terms but also the *enforcement* of foreign statutes prohibiting discovery).

*Aerospatiale*, 482 U.S. at 536. Such an outcome is inconsistent with *Aerospatiale*'s declaration that comity requires a *particularized*, case-by-case analysis of the interests at stake.[10] *See id.* at 543-44.

Here, the discovery sought by St. Jude is not discovery *of* personal data. It is discovery that *incidentally contains* personal data. Were St. Jude seeking a list of Biotronik's low-level employees with contact information and demographic data, or a database of Biotronik's customers and their purchase histories, this Court might arrive at a different conclusion. *Cf., e.g.*, *Volkswagen, A.G. v. Valdez*, 909 S.W.2d 900, 903 (Tex. 1995). But Germany's interest in prohibiting disclosure of documents that incidentally contain personal data is, by the very terms of the Directive, tempered by countervailing interests in the efficient conduct of discovery under judicial supervision and the just resolution of litigation.[11] Indeed, those interests are shared by the United States. Accordingly, the balance of national interests favors permitting St. Jude to conduct discovery under the Federal Rules.

Biotronik makes three other arguments in support of its assertion that the balance of interests favor use of the Convention rather than the Federal Rules. First, Biotronik argues that in addition to the BDSG, the German Telecommunications Act or Telekommunikationsgesetz ("TKG") prohibits the discovery sought here. But Biotronik raised the TKG for the first time in its reply brief, depriving the Court of adversarial briefing on the issue and thereby waiving the

---

[10] Such an outcome is also inconsistent with the Data Protection Working Party's recognition that "the Directive does not [in all cases] prevent transfers for litigation purposes." WP 158 at 7.

[11] Notably, Germany itself has made no expression of any sovereign interest in this case. *Cf. Richmark*, 959 F.2d at 1476 (detailing correspondence with the State Secrecy Bureau of the People's Republic of China); *In re Rubber Chems. Antitrust Litig.*, 486 F. Supp. 2d 1078, 1084 (N.D. Cal. 2007) (involving a letter to the Court from the European Commission). *See also Rubber Chems.*, 486 F. Supp. 2d at 1081 n.2 (describing two other district court cases in which the European Commission filed amicus briefs arguing against discovery).

argument. *See United States v. Puerta*, 982 F.2d 1297, 1300 n.1 (9th Cir. 1992) ("New arguments may not be introduced in a reply brief."). Even on the merits, however, Biotronik's TKG argument is meritless: Its conclusory assertion that "the TKG may subject criminal penalties for any review of emails" is insufficient to demonstrate that the TKG prohibits the discovery sought here.

Second, Biotronik argued in its opening brief (but not in its reply) that Article 273 of the Swiss Penal Code might subject it to liability for producing the requested discovery. Article 273 "creates criminal liability for '[a]ny person who has sought to discover a trade or business secret in order to make it accessible to' or 'who has made a trade or business secret accessible to an official or private foreign body, or a private foreign company, or to their agents.'" *S.E.C. v. Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d 323, 338 (N.D. Tex. 2011) (quoting Schweizerisches Strafgesetzbuch [StGB] [Criminal Code] Dec. 21, 1937, SR 311.0, art. 273 (Switz.)) (alteration in original). Biotronik has presented no further argument or evidence that this provision applies to an entity disclosing *its own* trade or business secret *in the context of litigation*. Thus, Biotronik again fails to meet its burden of demonstrating that Swiss law in fact prohibits the discovery sought.

Finally, Biotronik argues that Germany is "steadfastly opposed to U.S.-style discovery." As an initial matter, that blanket assertion appears incorrect—even in Germany, a party can take relevant discovery from a third party by court order,[12] much as St. Jude has done here. Moreover, only "important *substantive* policies," rather than "a general policy of the foreign state . . . to prefer its own system of litigation" are relevant to the interest-balancing analysis. RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 442 cmt. c. Thus, this argument fails as well.

---

[12] WP 158 at 5.

### 2.    The Importance of the Documents

Where evidence is "directly relevant" to the outcome of the litigation, this factor weighs in favor of disclosure. *Richmark*, 959 F.2d at 1475. On the other hand, where the evidence sought is less relevant or "largely cumulative of records already produced," courts are more reluctant to require production. *Id.*; *United States v. Vetco Inc.*, 691 F.2d 1281, 1290 (9th Cir. 1981). Similarly, the more important the evidence sought, the greater a party's claim to using the straightforward and efficient procedures of the Federal Rules.

In the underlying litigation, St. Jude essentially claims that Janssen was engaging in corporate espionage for Biotronik while still employed at St. Jude. The subpoena served by St. Jude accordingly includes requests for, among other things, all documents or files in Biotronik's possession that were obtained from St. Jude; all such documents relating to Janssen's past employment with St. Jude; and all expense reimbursements from Biotronik to Janssen during her time at St. Jude. Biotronik argues that St. Jude has already taken discovery from Janssen, but Janssen "deleted texts, phone contacts, and emails related to Biotronik," thereby precluding St. Jude from obtaining the documents it seeks here. *St. Jude Medical S.C., Inc. v. Janssen-Counotte*, No. A-14-CA-877-SS, slip op. at 25 (W.D. Tex. Dec. 17, 2014), Dkt. 45. Further, St. Jude has presented evidence, in the form of correspondence from Biotronik's litigation counsel, stating:

> •      Before being served process in this case (process she challenged), Ms. Janssen had the hard drive of her original company-issued laptop cleaned.
>
> •      Also before being served process, Ms. Janseen threw out 2 or 3 personal USB drives.
>
> •      In February 2015, Ms. Janssen's husband had his personal desktop computer (which Ms. Janssen had used from time to time before September 3, 2014) purged of certain information, including

> the records of when USB drives were connected to that
> computer. . . .

Dkt. 37-1 at 1. Thus, the evidence St. Jude seeks from Biotronik is not cumulative. Moreover, it

is relevant, and indeed, important, to the just and correct resolution of the underlying lawsuit. As

such, this factor weighs in favor of St. Jude.

### 3.   The Specificity of the Requests

Courts are reluctant to require "[g]eneralized searches for information" whose disclosure

may be prohibited under foreign law; accordingly, the more specific a request for evidence, the

more this factor weighs in favor of production. *See Richmark*, 959 F.2d at 1475. Moreover,

regardless of the legality of disclosure, this factor favors requests that impose less of a burden on

the producing party. *See id.* Even requests for a "great deal of evidence," however, will be

granted when the evidence is directly relevant to the purpose for which it is sought. *See id.*

Here, as previously noted, much of the evidence St. Jude seeks is directly relevant to the

underlying issues. Moreover, many of St. Jude's requests for evidence are limited in time to the

period when Janssen was employed by St. Jude. A similar limitation weighed in favor of the

requesting party in *Richmark*. *See id.* Thus, St. Jude's subpoena is sufficiently specific. This

factor weighs in favor of St. Jude.

### 4.   The Location of the Information and Parties

When "all the information to be disclosed (and the people who will be deposed or who

will produce the documents) are located in a foreign country," this factor "weighs against

disclosure, since those people and documents are subject to the law of that country in the

ordinary course of business." *Id.* Here, only information held in Europe by Biotronik's European

affiliates is at issue—there is no question that the Federal Rules supply the correct procedure for

obtaining evidence held by Biotronik U.S. Accordingly, this factor appears to weigh in favor of

mandatory use of Convention procedures. The weight of this factor, however, is undercut by two unusual facts: First, as discussed above, Janssen deleted potentially relevant documents that otherwise would have been available in the United States; and second, Biotronik U.S. maintains that, other than the employment agreement, it possesses absolutely no documents concerning the hiring of Janssen as its president. These unusual facts suggest a purposeful attempt to evade legal process in the United States by sheltering relevant information abroad. As such, the Court accords this factor little weight.

### 5. Alternative Means

If the party seeking discovery can easily obtain what it seeks using alternative domestic means, this factor weighs in favor of requiring Convention procedures for international discovery. *See id.* Any purported alternative means, however, must be "substantially equivalent" to the requested discovery—both in the substance of the information available and in the efficacy of the alternative means. *See id.* at 1475-76; *Vetco*, 691 F.2d at 1290. Biotronik suggests that St. Jude can obtain the same information from Janssen and from Biotronik U.S. as from Biotronik's European affiliates. But, as previously explained, Janssen deleted the relevant documents in her possession, and Biotronik U.S. claims not to have any in its possession relating to the hiring of its own president for U.S. operations. Thus, Biotronik's suggested alternative means have already proven futile, which is precisely why St. Jude seeks discovery from Biotronik's European affiliates. Therefore, this factor weighs in favor of discovery under the Federal Rules.

### 6. Hardship of Inconsistent Enforcement

Biotronik argues that the possibility of criminal sanctions in Europe is a hardship sufficient to excuse it from complying with St. Jude's subpoena. As with the balance of national interests, however, "[t]he party relying on foreign law has the burden of showing that such law

bars production." *Vetco*, 691 F.2d at 1289. Biotronik has failed to meet that burden. *See supra*

note 9 and accompanying text. Moreover, where a party is subject to hardship caused by its own

actions (or by those of its agents), this factor is not accorded much weight. *Richmark*, 959 F.2d

at 1477-78; *see Vetco*, 691 F.2d at 1289-90. Had Janssen not deleted the relevant documents in

the United States, or if Biotronik U.S. had records of its negotiations to hire its own president,

St. Jude might well have had sufficient alternative domestic means to conduct fair and

appropriate discovery. Any hardship to which Biotronik might be subject is, therefore,

self-inflicted. Accordingly, this factor does not weigh against discovery under the Federal Rules.

### 7.  Likelihood of Compliance

"If a discovery order is likely to be unenforceable, and therefore to have no practical

effect, [this] factor counsels against requiring compliance with the order." *Richmark*, 959 F.2d

at 1478. Similarly, if a request under the Convention is likely to be fruitless, this factor counsels

against requiring compliance with the Convention. Under Article 23 of the Convention, Germany

has flatly stated that "it will not, in its territory, execute Letters of Request issued for the purpose

of obtaining pre-trial discovery of documents as known in common law countries." *Declarations

and Reservations*, HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, http://www.hcch.net/

index_en.php?act=status.comment&csid=502&disp=resdn. Thus, even if the Court were to order

St. Jude to use Convention procedures, those procedures would likely be fruitless. By contrast,

there is no reason that a discovery order directed at Biotronik U.S. would be unenforceable.

Accordingly, this factor weighs in favor of discovery under the Federal Rules.

### 8.  Conclusion

With the exception of the location of the information and the parties, to which the Court

accords little weight for the reasons previously stated, all of the other factors in the comity

analysis weigh in favor of permitting St. Jude to proceed with discovery under the Federal Rules.

PAGE 21 – OPINION AND ORDER

It is also significant that the Court has not yet fully ruled on St. Jude's specific motion to compel compliance with its subpoena, including ruling on all of Biotronik's request-specific objections. The Court has determined that, at least in the first instance, those rulings should be made by the special master. Thus, the Court retains the power to restrict the extent of discovery under the Federal Rules, including for reasons of comity.

In its prior discovery orders in this case, the Court appointed a special master to supervise discovery and consider Biotronik's numerous request-specific objections to each of St. Jude's 31 discovery requests. For purposes of whether St. Jude must comply with the strictures of the Convention, the Court has evaluated the subpoena as a whole. If, however, any specific request and request-specific objection were evaluated by themselves, the balancing of the comity factors regarding that specific request and objection might result in a different conclusion. Thus, Biotronik may continue to press its specific objections to individual requests based on comity as well as domestic civil discovery principles. The special master shall evaluate St. Jude's requests and Biotronik's objections both under the Federal Rules governing civil discovery and under the comity analysis described in this Opinion and Order.

**D.  Biotronik's Motion to Transfer**

At the conclusion of its motion for reconsideration, Biotronik requests that this Court transfer consideration of St. Jude's motion to compel and Biotronik's objections and related issues to the Western District of Texas, where the underlying case is pending. As Biotronik correctly observes, Rule 45(f) of the Federal Rules of Civil Procedure authorizes the transfer of subpoena-related motions by "the court where compliance is required" (this Court) to the "issuing court if the person subject to the subpoena consents or if the court finds exceptional circumstances." Biotronik adds, for the first time in its motion for reconsideration or to transfer, that Biotronik now consents to such a transfer. Before this Court issued its first Opinion and

Order on March 23, 2015, however, Biotronik resisted transfer and insisted that St. Jude's motion to compel be heard in the District of Oregon (the court where compliance is required). *See* Dkt. 4-2 (email from Biotronik's counsel to St. Jude's counsel dated January 8, 2015) ("all issues relating to the enforcement of the Subpoena must be raised in the district court of Oregon, which is the district where compliance with the Subpoena is required. See Fed,R.Civ.P. 45(d)").

Had Biotronik timely consented under Rule 45(f) to transfer this discovery dispute in Biotronik's response to St. Jude's motion to compel, this Court almost certainly would have transferred this matter to the underlying court. The primary purpose of requiring that a third-party (or nonparty) discovery dispute be heard by the court where compliance is required is for the convenience and protection of the third-party (or nonparty) whose presence is found in the district where compliance is required. It would generally be unfair and unreasonably burdensome to require a third-party (or nonparty) to present its challenge to a subpoena in a remote location where the action is pending. As explained by the Civil Rules Advisory Committee:

> Subpoenas are essential to obtain discovery from nonparties. To protect local nonparties, local resolution of disputes about subpoenas is assured by the limitations of Rule 45(c) and the requirements in Rules 45(d) and (e) that motions be made in the court in which compliance is required under Rule 45(c). But transfer to the court where the action is pending is sometimes warranted. *If the person subject to the subpoena consents to transfer, Rule 45(f) provides that the court where compliance is required may do so*.
>
> In the absence of consent, the court may transfer in exceptional circumstances, and the proponent of the transfer bears the burden of showing that such circumstances are present. *The prime concern should be avoiding burdens on local nonparties subject to subpoenas*, and it should not be assumed that the issuing court is in a superior position to resolve subpoena-related motions. . . .

Advisory Committee Notes to Rule 45(f) (2013) (emphasis added).

PAGE 23 – OPINION AND ORDER

There are at least two flaws in Biotronik's argument requesting transfer. First, this is not an argument or request that Biotronik made in either its objections to St. Jude's subpoena or in response to St. Jude's motion to compel. Thus, Biotronik has waived this issue.

Second, and more fundamentally, nothing in Rule 45 permits such a transfer *after* a Court has already ruled on the merits of a discovery dispute. Indeed, it would violate fundamental principles of both fairness and efficient judicial case management to allow a nonparty subpoena recipient to challenge the subpoena twice—first in the court where compliance is required and then, if the nonparty is dissatisfied with the ruling on the merits, to request that the discovery dispute be transferred to the issuing court so that the nonparty may try for a different merits ruling before a different judge. Nothing in Rule 45 permits or authorizes such an action or even urges the court where compliance is required to exercise its discretion to accomplish such a result. To the extent that this Court has such discretion, and it may, it declines to exercise it based on considerations of both fairness and judicial efficiency.

**E.  Fees and Costs to be Borne by Each Party**

In the conclusion of St. Jude's memorandum in opposition to Biotronik's motion, St. Jude requests that the Court award St. Jude its fees and costs incurred in responding to Biotronik's motion for reconsideration and to transfer. St. Jude, however, provides no legal basis for that request. It is denied.

**CONCLUSION**

Biotronik's motion for reconsideration or to transfer (Dkt. 25) is DENIED. The Court's Orders of March 23, 2015 (Dkts. 19, 20) remain effective, as supplemented by this Opinion and Order. Specifically, the special master is directed to evaluate St. Jude's specific discovery requests and Biotronik's specific objections both under the Federal Rules governing civil discovery and under the comity analysis set forth by the Court in this Opinion and Order. All

parties retain the right to file objections with this Court to any rulings issued by the special

master. Finally, absent prior agreement by all affected parties, all production from outside the

United States pursuant to St. Jude's subpoena issued to Biotronik containing personal data shall

be restricted to attorneys' eyes only, and if responsive documents are filed either in this Court or

in the Court where the underlying case is being heard, they shall be filed under seal, unless

otherwise ordered by the applicable court in which such documents are filed.

**IT IS SO ORDERED**.

DATED this 18th day of May, 2015.

/s/ Michael H. Simon   
Michael H. Simon
United States District Judge
